**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| JESSE HIGGINS, ) | |
| ) | CASE NO.   1:08-cv-1016 |
| Plaintiff, ) | |
| ) | |
| v. ) | MAGISTRATE JUDGE VECCHIARELLI |
| ) | |
| MICHAEL J. ASTRUE, ) | |
|   Commissioner of Social Security, ) | **MEMORANDUM OF OPINION** |
| ) | |
| Defendant. ) | |

This case is before the magistrate judge by the consent of the parties.  Plaintiff, Jesse Higgins ("Higgins"), challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Higgins' application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 423 and 1381(a).  This court has jurisdiction pursuant to 42 U.S.C. § 405(g).

For the reasons set forth below, the court AFFIRMS the decision of the Commissioner.

I.  Procedural History

Higgins filed an application for SSI on July 25, 2003, alleging disability due to anxiety, paranoia, and depression.  His application was denied initially and upon reconsideration.  Higgins timely requested an administrative hearing.

Administrative Law Judge Patricia Yonushonis ("ALJ") held a hearing on March 22,

2006.  Higgins, represented by counsel, testified on his own behalf at the hearing.  Linda Smith testified as a vocational expert ("VE"), and Carol Kunz-Lesky testified as a medical expert ("ME").  The ALJ issued a decision on June 13, 2006 in which she determined that Higgins is not disabled.  Higgins requested a review of the ALJ's decision by the Appeals Council.  When the Appeals Council declined further review on March 21, 2007, the ALJ's decision became the final decision of the Commissioner.

Higgins filed an appeal to this court on April 19, 2008.  Higgins alleges that the ALJ erred because (1) the ALJ failed to give proper weight to the opinions of Higgins' treating physicians; (2) the ALJ's findings regarding Higgins' non-exertional limitations are not supported by substantial evidence; and (3) Higgins' impairment meets the listing at 20 C.F.R. Ch. III, Pt. 404, Subpart P, App. 1, § 12.06 ("listing 12.06").  The Commissioner denies that the ALJ erred.

## II.  Evidence

*A.   Personal and Vocational Evidence*

Higgins was born on November 12, 1978 and was 27 years old at the time of his hearing.  He has an eighth grade education.  Although he has worked in the past as a cleaner, he has no past relevant work experience because he has not worked at a substantial level within the past 15 years.  Higgins alleges that he is unable to work because he suffers from anxiety, nervousness, and panic attacks in the presence of others and has trouble with interpersonal conflicts and physical altercations with others due to difficulties controlling his anger.

*B.   Medical Evidence*

Byong J. Ahn, M.D., a psychiatrist, evaluated Higgins on May 12, 1994 when Higgins

2

was 15 years old. Transcript ("Tr."), pp. 172-73. Higgins had been charged with felonious assault for using steel-toed shoes to injure someone severely. The juvenile authorities briefly sent him to a Juvenile Detention Home and warned him that he might have to return again. Despite this warning, Higgins assaulted someone at school so badly that the victim was removed in an ambulance. Higgins told Dr. Ahn that he had been having problems controlling his anger for the past few years. According to Higgins, he sometimes became enraged and could not control his actions. Higgins was failing all his subjects at school. Dr. Ahn diagnosed Higgins as suffering from impulse control disorder, intermittent explosive disorder, and atypical depression. Dr. Ahn prescribed lithium, and a later treatment note indicated that the lithium markedly improved Higgins' affect and behavior. Tr. at 174.

Robert Falkenstine, a licensed social worker, interviewed Higgins on July 17, 2000. Tr. at 228-30. Higgins reported problems with his live-in girlfriend, including verbal altercations, and anger at a neighbor. He also reported that he was having problems with the custody of his children and isolated himself to avoid fights with others. Higgins told Falkenstine that he had difficulty sleeping and occasionally suffered blackouts when he became enraged. Falkenstine assessed Higgins' intellectual skills as average, but Higgins had limited insight and questionable judgment in conflict situations. Falkenstine diagnosed Higgins as suffering from a moderate mixed disturbance of emotions and conduct and a moderate antisocial personality disorder. He assigned Higgins a Global Assessment of Functioning ("GAF") of 53.[1]

Theophilus Arthur Mensah, M.D., a psychiatrist, saw Higgins on referral from

---

[1] A GAF score of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.

Higgins' general physician on August 22, 2000.  Tr. at 222-25.  Higgins reported sleeplessness, difficulty leaving the house to face people, and a fear of being attacked by others.  He had recently pushed his live-in girlfriend down the stairs and had been jailed.  He admitted engaging in many fights in childhood, both giving and receiving serious damage.  His father had been a boxer who taught him boxing and martial arts and threatened to beat him if he backed away from a fight.  Higgins detailed a family history of depression, social anxiety, alcoholism, and criminal activity.  Dr. Mensah noted a history of being unable to hold employment because Higgins had problems with temper and tended to get into fights.  The doctor found no gross cognitive defects, intact memory, limited insight, and grossly adequate judgment.  He diagnosed Higgins as suffering from a dysthymic disorder, a panic disorder with agoraphobia, and a personality disorder with antisocial features.

Higgins saw Dr. Ahn on April 15, 2002.  Tr. 240-44.  Higgins reported that since last seeing Dr. Ahn, he had been charged with assault 20 times, with domestic violence three or four times, had been charged with domestic assault by each of the three women with whom he had children, and had recently been jailed for severely assaulting a man he suspected of having an affair with his girlfriend.  Higgins also said that he had been unable to hold a job because he assaults people, that he did not like people, and that he believed they were always talking about him.  Higgins described himself as suffering from mood swings and a dysphoric mood.  He stated that when he loses his temper he often does not know what he is doing until he calms down.  Dr. Ahn described Higgins as "presently irritable and dysphoric with poor concentration and vegetative functioning." Tr. at 243. The doctor diagnosed intermittent explosive disorder and prescribed lithium, Wellbutrin, and

4

Risperdal.

Following his examination of Higgins, Dr. Ahn completed a Mental Functional Capacity Assessment of Higgins. Dr. Ahn opined that Higgins was moderately limited in his abilities to carry out short, simple instructions; sustain an ordinary routine without special supervision; make simple, work-related decisions; ask simple questions or request assistance; be aware of normal hazards and take appropriate precautions; and travel in unfamiliar places or use public transportation. Dr. Ahn also found that Higgins was markedly limited in his abilities to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and respond appropriately to changes in the work setting. He also opined that Higgins was extremely limited in his abilities to work in coordination with or proximity to others without being distracted by them, accept instructions and respond appropriately to criticism from supervisors, and set realistic goals or make plans independently of others. Dr. Ahn concluded that Higgins was unemployable.

Higgins visited Dr. Dilbagh Saini, M.D., a psychiatrist, on July 24, 2002. Tr. at 245-46. Higgins described his history of violence, his anxiety around and avoidance of crowds, and his treatment by Dr. Ahn. Higgins complained of sleeplessness, and Dr. Saini noted paranoia or suspiciousness. The doctor found no formal thought disorder, although insight and judgment were limited. Dr. Saini diagnosed Higgins as suffering from bipolar affective

5

disorder and a personality disorder with antisocial features.  On July 30, 2002, Dr. Saini completed a Mental Functioning Capacity Assessment of Higgins.  He opined that Higgins was extremely limited in his ability to work in coordination or proximity with others without being distracted by them, his ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, his ability to accept instructions and respond appropriately to criticism from supervisors, his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and his ability to respond appropriately to changes in the work setting.  Dr. Saini concluded that Higgins is unemployable.

Thomas Zeck, Ph.D., examined Higgins at the request of the Bureau of Disability Determination ("the Bureau") on August 19, 2002.  Tr. at 248-53.  Higgins reported that a restraining order prevented him from seeing his children and admitted staying up for days in a row, an inability to work due to problems with anger, nervousness around others, and intermittent crying spells.  In addition to describing his history of violence, Higgins told Dr. Zeck that he had been charged with automobile theft and breaking and entering.  Higgins also reported that he had worked at Marc's, Angelica's, Invacare, OSS Corporation, and Cloverdale but was fired for not showing up at work or engaging in aggressive behaviors.  Anger also prevented him from completing the Rising Tide Program.  Dr. Zeck found Higgins to be coherent, relaxed, and oriented, with mnemonic ability in the low average range, ability to calculate in the borderline range, and judgment in the borderline range.  Dr. Zeck diagnosed Higgins as suffering from an intermittent explosive disorder and a

personality disorder and assigned him a GAF of 47.[2]  In discussing Higgins' work-related mental abilities, Dr. Zeck wrote that Higgins' tendency to get upset and abuse or assault others, his low-average intellectual ability, and inability to withstand stress all make employment difficult to maintain.  He also opined that Higgins "could possibly be weaned into a situation in combination with his medication to see how well he handles a particular job which does not entail a great deal of interaction with others."  Tr. at 252-53.

On August 27, 2002, William B. Benninger, Ph.D., completed a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment of Higgins on the basis of a review of Higgins' file.  Tr. at 254-69.  Dr. Benninger diagnosed Higgins as suffering from intermittent explosive disorder, a depressive disorder, and a personality disorder.  He opined that Higgins experienced mild restrictions of daily living; moderate difficulties maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace.  He also opined that Higgins was moderately limited in his abilities to understand and remember detailed instructions, carry out detailed instructions, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in the work setting.  Dr. Benninger also found Higgins was markedly limited in his ability to interact appropriately with the general public and that evidence did not establish the presence of the "C" criteria

---

[2]  A GAF of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.

at listing 12.06. In conclusion, Dr. Benninger asserted that Higgins "would be able to carry out simple 1-2 step tasks that do not require strict quotas or time restraints [sic] as stress would cause problems with anger management." Tr. at 269.

On March 17, 2003, Higgins visited the emergency room to receive treatment for a fractured nose and facial swelling suffered when he was assaulted by a number of assailants. Tr. at 302-09. On July 13, 2003, Higgins visited the emergency room to receive treatment for suicidal ideation, depression, agitation, and anger. Tr. at 281-91. The attending nurse noted some evidence of PTSD.

Ronald G. Smith, Ph.D., examined Higgins at the request of the Bureau on November 5, 2003. Tr. at 342-45. Higgins admitted difficulties in concentrating, nervousness and anxiety around people, and problems with assaulting his girlfriends. He said that he stays at home now. Higgins also told Dr. Smith that he had problems with school, with a series of assaults and fights beginning in fifth grade, and with sleeplessness. Dr. Smith diagnosed Higgins as suffering from bipolar disorder in partial remission and impulse control disorder and assigned him a GAF of 55. Dr. Smith summarized his assessment of Higgins as follows:

> His ability to maintain concentration and attention appears to be fairly good as long as he is not bothered by feelings of anger or anxiety. His ability to follow simple one or two step job instructions would seem to be good on a strictly cognitive basis. His ability to relate to the public, coworkers, supervisors will still be likely to be impaired because of his lifelong tendency to be easily aroused emotionally with angry feelings and a tendency to act them out with hitting, fighting, and hostility.

Tr. at 344.

Alice Chambly, Psy. D., reviewed Higgins' file and completed a Psychiatric Review Technigue and a Mental Residual Functional Capacity form on December 4, 2003. Tr. at

346-61.  Dr. Chambly diagnosed Higgins as suffering from bipolar disorder in partial remission and impulse control disorder and opined that he experienced mild restrictions of daily living; moderate difficulties maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace.  She also noted that he had suffered one or two episodes of decompensation of extended duration.  Dr. Chambly also opined that Higgins was moderately limited in his abilities to understand and remember detailed instructions, carry out detailed instructions, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in the work setting.  Dr. Chambly also found Higgins to be markedly limited in his ability to interact appropriately with the general public.  In conclusion, Dr. Chambly asserted that Higgins "has no substantial loss of ability to meet the mental demands of simple, routine activities which minimize social exposure."  Tr. at 361.  Dr. Cahmbly's opinion was affirmed on December 4, 2003 by Catherine A. Flynn, Psy. D.  Tr. at 361.

Shirley J. Smith, a Licensed Professional Clinical Counselor at Nord Center, completed a Daily Activities Questionnaire assessing Higgins on April 20, 2004. Tr. at 365-67.  Smith noted that Higgins lived with his mother and next to his grandmother, mostly stayed in his room due to panic attacks, and did not get along with others.  She also noted a history of being fired because of his temper.  Smith wrote that Higgins had been compliant in attending his bi-weekly counseling sessions at Nord Center but not always

compliant in completing homework.

Over the next 6 months, clinicians and counselors at Nord Center recorded Higgins' progress and activities. Tr. at 368-87. Higgins' had an adverse reaction to Strattera in August 2004, resulting in severe panic attacks, shaking, staring, and sweats. Tr. at 376. On October 22, 2004, he reported going out more, attending school, visiting friends and his girlfriend's brother, and "transforming his thinking . . . ." Tr. at 368. By March 21, 2005, however, after going without his medication, Higgins reported increased symptoms of panic, an altercation with his cousin and uncle, and ongoing isolation from others due to panic and anxiety. Higgins reported continued panic attacks, anxiety, and avoidance of others in August and September of 2005. Tr. at 458, 461.

*C.  Hearing testimony*

At the hearing on March 22, 2006, Higgins testified regarding his anxiety and panic around others, his isolation, his problems with anger, and his history of being fired when he loses his temper. Tr. at 503-10. He also testified that he had problems remembering instructions and some back problems from the assault he suffered in March 2003. Tr. at 511-14. His daily activities consisted of watching television, playing video games, occasionally going outside, and receiving visits from friends. Tr. at 515-20. Higgins said that he was taking Celexa and Depakote for his symptoms and was seeing a psychiatrist and a counselor. Tr. at 522-23. He also said that he drank about three caffeinated sodas and half a pot of coffee a day. Tr. at 528-29.

The ME testified that she believed that Higgins' anger and aggression were habitual but within his control and that his anxiety was aggravated by his substantial caffeine intake. Tr. at 525-29. The ME also testified that Higgins' anxiety and agoraphobia were treatable

10

but that Higgins should be restricted to work that did not require contact with the public, had little contact with supervisors and co-workers, and did not require quotas. Tr. at 530-31. The ME concluded that Higgins' impairments did not meet or equal the requirements of any listing. Tr. at 530.

The ALJ asked the VE to assume a hypothetical individual of Higgins' age, education, and work experience with no physical limitations and the mental limitations described by the ME. He then asked if Higgins would be able to do any of his past work. The VE responded that Higgins would be able to do the job of cleaner and stocker. Tr. at 536-37. The ALJ also asked the VE to assume a hypothetical individual of Higgins' age, education, and past work experience, limited to light work and the mental limitations described by the ME. The VE opined that such an individual could perform the job of stocker as Higgins performed it and the job of cleaner as described and performed. Tr. at 537. Finally, the ALJ asked the VE to assume a hypothetical individual of Higgins' age, education, and past work experience, limited to light work and the mental limitations described by Higgins. When asked if such an individual could perform any of Higgins' past work, the VE said that such an individual could not. Tr. at 537.

### III. Standard for Disability

A claimant is entitled to receive benefits under the Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R.

11

§ 416.905(a). To receive SSI benefits, a recipient must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

IV. Summary of Commissioner's Decision

In relevant part, the ALJ made the following findings:

1. Mr. Higgins has not engaged in substantial gainful activity at any time relevant to this decision.

2. Mr. Higgins' impairments are best described as an impulse control disorder; atypical depression; anxiety; and a caffeine addiction. These impairments are considered "severe" within the specialized meaning of the Social Security Act because in combination they significantly interfere with his ability to engage in basic work activities.

3. Mr. Higgins does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, I find that, during the period relevant to this decision, Mr. Higgins has no limitations caused by a physical impairment but his mental impairments have limited him to simple, repetitive work involving no interaction with the public and only minimal interaction with co-workers and supervisors. In addition, Mr. Higgins is limited to low stress work which does not involve arbitration, confrontation, negotiation, or being responsible for the safety of others. Mr. Higgins also cannot perform work that is considered fast paced. Instead, Mr. Higgins can only perform work that involves low production quotas.

5. Mr. Higgins is capable of performing past relevant work as a cleaner. This work does not require the performance of work-related activities precluded by Mr. Higgins' residual functional capacity (20 CFR 416.965).

6. Mr. Higgins has not been under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 416.920(f)).

Tr. at 16-27. The ALJ adopted the opinion of the ME regarding the extent of Higgins' non-exertional limitations.

## V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a

13

preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI. Analysis

Higgins alleges that the ALJ erred because (1) the ALJ failed to give proper weight to the opinions of Higgins' treating physicians; (2) the ALJ's findings regarding Higgins' non-exertional limitations are not supported by substantial evidence; and (3) Higgins' impairments meet the requirements of listing 12.06.

*A.  Whether the ALJ erred in failing to accord the opinions of Drs. Ahn and Saini the deference due the opinions of treating physicians*

Higgins contends that the ALJ erred because she failed to give the opinions of Drs. Ahn and Saini the deference due the opinions of treating physicians. The Commissioner responds that Drs. Ahn and Saini did not have a continuing relationship with Higgins necessary for them to be regarded as treating physicians.

The medical opinion of treating physicians should be given greater weight than those of physicians hired by the Commissioner. *Lashley v. Secretary of Health and Human Servs.,* 708 F.2d 1048 (6th Cir. 1983). Medical opinions are statements about the nature and severity of a patient's impairments, including symptoms, diagnosis, prognosis, what a patient can still do despite impairments, and a patient's physical or mental restrictions. 20 C.F.R. § 404.1527(a)(2).

Title 20 C.F.R. § 416.902 ("§ 416.902") defines a treating source, in relevant part, as follows:

> Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an

14

> acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s).

The same section also defines a nontreating source: "Nontreating source means a physician, psychologist, or other acceptable medical source who has examined you but does not have, or did not have, an ongoing treatment relationship with you." A physician who sees a patient once is not a "treating physician" within the meaning of § 416.902. *See Smith v. Commissioner*, 482 F.3d 873, 876 (6th Cir. 2007); *Hoskins v. Commissioner*, 2004 WL 1791477, at \*\*2 (6th Cir. Aug. 6, 2004). Likewise, a physician who examines a patient two times when the patient sees other sources much more frequently for the same condition is not a "treating physician" for the purposes of § 416.902. Finally, a physician who sees a patient annually for three years to treat a condition requiring much more frequent treatment is not a "treating physician" for purposes of § 416.902. *Boucher v. Apfel*, 2000 WL 1769520, \*9 (6th Cir. Nov. 15, 2000).

In the instant case, Dr. Ahn saw Higgins regarding Higgins' psychological problems on three occasions: twice in 1994 and once in 2002. During that same period and afterward, Higgins saw other treating professionals for his psychological problems far more frequently. Given the great infrequency of Higgins' visits with Dr. Ahn and the eight-year interval between the second and third visits, Dr. Ahn cannot be a treating physician for a condition requiring more frequent treatment for purposes of § 416.902. Similarly, Higgins saw Dr. Saini for his psychological problems only once, on July 24, 2002. Again, Higgins sought the help of other treatment professionals on many occasions after his visit with Dr.

Saini. A single treatment session more than three and a half years before Higgins' hearing with the ALJ for a condition requiring much more frequent treatment is not legally sufficient to make Dr. Saini a treating physician within the meaning of § 416.902.

Moreover, the ALJ's specific and thorough citations to the record in explaining why she failed to accord the opinions of Drs. Ahn and Saini controlling weight demonstrate that she considered carefully all relevant factors in determining the weight to give the opinions of these doctors. Tr. at 18-25. The ALJ's conclusions regarding the weight to give the opinions of the various physicians in the record are particularly well-supported.

All of the reasons described above, the ALJ did not err when she failed to accord the opinions of Drs. Ahn and Saini the deference due the opinions of treating physicians.

*B      Whether the ALJ's findings regarding Higgins' non-exertional limitations are supported by substantial evidence*

Higgins argues that his criminal and medical history indicate that he has far more severe and numerous psychological limitations than those found by the ALJ. He cites Higgins' many criminal assaults, Higgins' avoidance of other people, and the opinions of Drs. Saini, Ahn, Zeck, and Smith as evidence supporting this argument.

The ALJ noted that the ME's testimony indicated that Higgins' criminal behaviors were more volitional than the unavoidable product of his mental impairments and were aggravated by his caffeine intake. The ME also testified that Higgins' avoidance of others was treatable. No medical source directly contradicts this testimony. Thus, Higgins' criminal record and isolation are of limited value as evidence that Higgins cannot perform light work that does not require contact with the public, includes little contact with supervisors and co-workers, and does not require quotas.

16

Although Dr. Zeck found that Higgins' aggressive behaviors, low-average intellectual ability, and low tolerance for stress make employment difficult, he also opined that Higgins "could possibly be weaned into a situation in combination with his medication to see how well he handles a particular job which does not entail a great deal of interaction with others." Tr. at 252-53. This is consistent with the ME's testimony.

Nothing in Dr. Smith's assessment of Higgins contradicts the ME's testimony. Moreover, Dr. Smith assigned Higgins a GAF of 55, indicating moderate rather than severe symptoms.

The opinions of Drs. Ahn and Saini do, indeed, contradict the ME's opinion. However, as already noted, the ALJ was not required to accord the opinions of these physicians the weight given to the opinions of treating physicians.

The opinions of Drs. Benninger, Chambly, and Flynn, in addition to the opinions of Drs. Zeck and Smith, are consistent with the ME's opinion regarding Higgins' limitations. Dr. Benninger found that Higgins "would be able to carry out simple 1-2 step tasks that do not require strict quotas or time restraints [sic] as stress would cause problems with anger management." Tr. at 269. Dr. Chambly opined that Higgins "has no substantial loss of ability to meet the mental demands of simple, routine activities which minimize social exposure." Tr. at 361. Dr. Flynn affirmed Dr. Chambly's opinion.

"[W]hen the record contains inconsistent or conflicting medical opinions it is the Secretary's responsibility to weigh these opinions. *Sharp v. Sullivan*, 1990 WL 93397, at *5 (6th Cir. July 6, 1990); *see also Floyd v. Finch,* 441 F.2d 73, 76 (6th Cir. 1971). The ALJ accorded the opinions of the ME and Drs. Zeck, Smith, Benninger, Chambly, and Flynn greater weight than the opinions of Drs. Ahn and Saini. This was his prerogative. Given

17

the number of medical opinions consistent with the ALJ's opinion, the ALJ's opinion regarding Higgins' non-exertional limitations was supported by substantial evidence. Higgins' arguments to the contrary are not well-taken.

*C.    Whether Higgins' impairments meet the requirements of listing 12.06*

Higgins contends that his impairments meet the requirements of listing 12.06, anxiety-related disorders.[3] Listing 12.06 requires either of the following at subsections B and C:

> B. [Anxiety] resulting in at least two of the following:
> 1. Marked restrictions of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.
>
> OR
>
> C. [Anxiety r]esulting in complete inability to function independently outside the area of one's home.

No treating source, examining source, or evaluating source has found that Higgins has two of the following:  marked restrictions of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  No treating source, examining source, or evaluating source, other than Drs. Ahn or Saini, has found that Higgins has more than a single marked restriction, *viz.* in his ability to deal with the

---

[3] Higgins' brief references on one occasion 20 C.F.R. Ch. III, Pt. 404, Subpart P, App. 1, § 12.04 as the listing met by Higgins' impairments.  Otherwise, Higgins' brief gives listing 12.06 as the appropriate listing, and Higgins' analysis employs the requirements of listing 12.06 in supporting his argument.  The court concludes, therefore, that Higgins is placing listing 12.06 at issue.

general public. No treating source, examining source, or evaluating source has found that Higgins suffers from anxiety to such an extent that he is completely unable to function outside the home. Indeed, the record is replete with evidence that Higgins is able to function independently, to some extent, outside the home. The ME found that Higgins did not meet the requirements of any listing, and Dr. Benninger found that Higgins did not meet the requirements at either B or C of listing 12.06.

Higgins' contention that his impairments meet the requirements of listing 12.06 is unsupported by the record, and the ALJ's decision finding that Higgins' impairments do not meet the requirements of listing 12.06 is supported by substantial evidence. Higgins' argument that his symptoms meet the requirements of listing 12.06, therefore, are not well-taken.

### VII. Decision

For the reasons given above, the court AFFIRMS the decision of the Commissioner.

**IT IS SO ORDERED.**

Date: March 4, 2009             s/ Nancy A. Vecchiarelli
                                U.S. Magistrate Judge